UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

PALANTIR TECHNOLOGIES, INC.,

    Plaintiff,

v.

PALANTIR.NET, INC.,

    Defendant.

No. C 07 3863 CRB

## DECLARATION OF TIFFANY FARRISS

1. I am the president of Palantir.net, Inc., a corporation in good standing in the State of Illinois, which was incorporated on April 24, 2000.

2. I am over the age of 21 years and, if called as a witness, I could testify competently as to the matters set forth in this Declaration.

3. Prior to its incorporation, Palantir.net was a sole proprietorship. The company has been using the mark "PALANTIR®" since 1996 in connection with a variety of computer software services.

4. On April 22, 2002, Palantir.net applied for a federal registration for PALANTIR. The mark achieved registration on January 31, 2006, based on a first use date of July, 1996. The registration is for use in connection with "computer services, namely designing and hosting network web sites for others, designing database software for others, designing multi-media software for others, and design in the field of multi-media presentations for others."

5. In early February, 2007, I become aware of the firm calling itself Palantir Technologies, Inc. ("PTI") when I noticed that company was recruiting through the same service as Palantir.net.

6. Along with George DeMet, co-founder of Palantir.net and the company's secretary, we authorized counsel to send a cease and desist letter to PTI. Based on our review of that company's website, www.palantirtech.com, it was apparent to me that PTI, a start-up company, was intending to provide database software to others while using our registered mark as an identifier.

7. I subsequently learned that, two days after our counsel sent a cease and desist letter to PTI, that company filed a trademark application with the United States Trademark and Patent Office for the mark "Palantir," but in a different class that Palantir.net's registered mark.

8. I understand that our counsel thereafter advised PTI's counsel that, at a minimum, we would oppose registration of that mark in the event that it proceeded to publication in the *Official Gazette*. Through our counsel, we continued to insist that PTI cease use of "Palantir" in its trade name and brand, and that PTI adopt a new tradename and mark not confusingly similar to PALANTIR for identical or related goods and/or services.

9. Thereafter, I understand counsel for PTI suggested that the parties meet to discuss their respective services, on the theory that such discussion would convince me and George DeMet that PTI was intending to offer services somewhat different from those offered by Palantir.net. Having reviewed PTI's website, and having already experienced confusion amongst applicants for employment at our respective companies, Mr. DeMet and I determined that there would be no useful purpose in such meeting. We accordingly directed our counsel to decline such a meeting and reiterated that PTI needed to adopt a new mark.

10. Because PTI identified itself as a "start-up company," and because its application for trademark registration was filed on an intent-to-use basis, it seemed clear to me that PTI was in an excellent position to adopt a new mark with little or no disruption to its business.

11. Despite our expressed *unwillingness* to meet with principals for PTI, and while we were out of the country, we were advised in late May, 2007 that Alex Karp, on behalf of PTI, telephoned the office, requesting the opportunity to "talk with us directly."

12. After additional telephone conferences and e-mail exchanges, we agreed to meet with Mr. Karp along with our counsel in Chicago. That meeting was held on June 28, 2007.

13. Several days prior to the meeting, Mr. Karp telephoned and left a message suggesting that the meeting should occur at his hotel in Chicago and be without the presence of our attorney. However, Mr. DeMet and I insisted that the meeting proceed as scheduled, *i.e.* at our counsel's office and with our counsel present.

14. At the meeting, our counsel, Thomas Rosenwein, began by stating that it was his preference that Mr. Karp had been accompanied by his counsel. Mr. Karp responded by saying that he had a law degree as well as vast experience in organizing companies, so that his own counsel was not necessary.

15. Mr. Karp repeatedly expressed his personal and professional dislike for litigation, stating that he preferred to "work out" the situation amicably. Mr. Karp stated that his desired outcome for both companies to use "Palantir" with PTI compensating Palantir.net for the "inconvenience." Mr. Karp suggested that as compensation for such "inconvenience," PTI would pay Palantir.net $25,000 per year. I objected strongly to that proposal.

16. I told Mr. Karp that in my view the only question for discussion was which of our firms was to continue using "Palantir," as both could not continue to use the name given the overlap in services and incidents of confusion that had already occurred, despite PTI's virtual absence of advertising and marketing. I told Mr. Karp that given our growth over the years and

projected growth for the future, as well as PTI's anticipated profile once it emerged from its "stealth mode," the likelihood of confusion was great and the impact on our company significant.

17. Mr. Karp responded by stating that in his view, proprietary rights in trademarks and other intellectual property were impediments to the free development of technology. He also stated that engaging in a lawsuit regarding our trademark dispute would be counter productive for both parties. He advised us that his company's trademark application had cleared its initial submission in the Trademark Office and would be approved. He reiterated that if we engaged in litigation, it would takes several years and hundreds of thousands of dollars in legal costs, and that PTI would have a 50/50 chance of success.

18. I told Mr. Karp that we had spent 11 years building our business and would do whatever was necessary to defend it and the Palantir trademark. I disagreed with his assessment of our chances in litigation, as did our counsel. I told him that we were prepared for a protracted and costly legal battle if that was necessary. I also reminded him that his company's mark had yet to be published in the *Official Gazette* and that we intended to oppose that mark if it reached the publication stage. Mr. Karp then reiterated his experience of running various business and how a lawsuit would be a huge mistake for Palantir.net. He stated that he had a good sense of what our company's revenues might be, and that a lawsuit might be potentially ruinous for us.

19. I assured him that his assumptions about the scope and scale of our business were inaccurate, again referring to our 11 year history in business and our growth of employees and current recruitment for additional help.

20. I also questioned his skill and experience in running businesses as he apparently did not perform his due diligence in clearing the "Palantir" name before starting up his current venture. Our application for PALANTIR was filed in April, 2002 and was a matter of public

record in the United States Patent and Trademark Office for anyone who was searching for marks.

21.   I also told Mr. Karp that Palantir.net is in a very brand-conscience industry so that any potential confusion with a firm that had the potential to be sold, as many start-ups are intended to be, or would not survive, as many start-ups unintentionally end up, would damage our reputation. I stated that Mr. DeMet and I had invested consistently in building a reputation as a solid, established technology solution provider based on traditional values, not as a venture capital enterprise. The association with a firm such as PTI could only serve to confuse customers and undermine the brand equity and recognition that Palantir.net had built.

22.   Mr. Karp conceded that PTI would either be successful, which he defined as a sale to a large software provider such as Oracle or IBM, or would go out of business within two to five years. I responded by noting that he effectively proven our point. Mr. DeMet and I were life-style entrepreneurs and based our business on continuity and consistency. Any potential association with a firm intending to be sold or worst case, ending in bankruptcy, would be harmful to our brand.

23.   I also addressed specifically the monetary proposal that Mr. Karp had made. I estimated that were Palantir.net rename itself, the out-of-pocket costs would be in the neighborhood of $500,000 and that any settlement would require those costs to be covered as well as compensation for the loss of brand equity.

24.   Mr. Karp responded that his company was based in Silicone Valley and he intended to do much of his work for the government. I advised him that Palantir.net had done work for California customers and for governmental entities and governmental contractors.

25. Mr. Karp expressed some surprise at this information and returned to his proposal for compensation for joint use of "Palantir." He floated the idea of a percentage of profits be paid to Palantir.net with some sort of annual cap, which he thought he initially be set at $100,000.

26. We thereafter discussed again PTI's business plan, which Mr. Karp reiterated involved the potential sale of the business to a larger company. Mr. Karp acknowledged that in such a scenario the acquiring company would no longer use the "Palantir" name and mark. Mr. DeMet and Mr. Rosenwein stated in response that, given that likelihood, it made good sense for PTI to change its name and mark now so as to avoid any confusion or litigation with Palantir.net, and that PTI would be allowed sufficient time to do so.

27. Mr. Karp asked that he be allowed to discuss the situation with his board and to provide us with a more concrete offer. Mr. Karp said he would present his board with several options: annual payments to Palantir.net for the concurrent use of "Palantir"; purchase of our company; or changing PTI's name and mark to one that was not similar or likely to confuse. He said that he would have his company's lawyer provide us with a specific proposal within two weeks. We responded by saying that we would consider such a proposal in good faith.

28. Immediately following the meeting, Mr. DeMet and I instructed our counsel to prepare a draft complaint against PTI for trademark infringement and related claims. We were concerned that settlement negotiations might not yield a acceptable solution. However, in light of the apparent good faith of Mr. Karp in journeying to Chicago to make his proposal and his repeated statements at the meeting of his interest in an amicable resolution, we decided not to file immediately, but to allow what appeared to be good faith negotiations to continue in the hope that an acceptable resolution could be reached.

29. On July 13, 2007, our counsel forwarded to us the written proposal that had been submitted by PTI. That proposal was a slight variation on the one that Mr. Karp had presented at the June 28th meeting. It proposed a somewhat higher annual payment, but did not contain a percentage of revenues provision, nor a willingness to change its mark.

30. Mr. DeMet and I then considered whether we should terminate the settlement discussions and file suit. However, as there had been some movement from the original proposal that Mr. Karp had made, and because we understood that the attorney for PTI had given no indication that PTI was itself preparing to file suit, we prepared and submitted a counter-proposal that would restrict PTI to the use of "Palantir" solely in connection with the term "Palantir Technologies" as well as employing a disclaimer of affiliation with our company. Our counter-proposal also called for an initial down payment and higher annual payments.

31. We were advised thereafter that counsel for PTI had requested that our counter-proposal be provided to him in Word format. This indicated to us that PTI would be using our counter-proposal to fashion a response. As a result, we awaited a further settlement proposal from PTI.

32. However, four days later, on Saturday, June 28, 2007, we received an e-mail from a law firm in San Francisco (which we had no prior relationship) advising us that on June 27, 2007, we had been sued by PTI in the Northern District of California. We immediately contacted our counsel, who promptly filed our complaint for trademark infringement and related statutory and common law torts on Monday, July 30, 2007.

FROM :Palantir.net    FAX NO. :8473282211    Aug. 16 2007 04:31PM P2

FURTHER DECLARANT SAYETH NAUGHT.

I, Tiffany Farriss, declare under penalty of perjury under the law of the United States, the foregoing is true and correct. Executed in Evanston, Illinois on August 15, 2007.

_____
Tiffany Farriss