**JOSEPH L. STRABALA**
**JOE STRABALA LAW OFFICE**
One Embarcadero Center, Suite 1020
San Francisco, CA 94111-3698
Telephone: (415) 981-8083
Facsimile: (415) 495-3351
Email: jslaw@pacbell.net
State Bar No. 34832

**THOMAS D. ROSENWEIN**
**DON E. GLICKMAN**
**JAMES A. FLESCH**
**GORDON, GLICKMAN, FLESCH & ROSENWEIN**
140 South Dearborn Street, Suite 404
Chicago, IL 60603
Telephone: (312) 346-1080
Facsimile: (312) 346-3708
Email: trosenwein@lawggf.com

Attorneys for Defendant
PALANTIR.NET, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PALANTIR TECHNOLOGIES INC., | ) Case No.: C -07 3863 CRB |
| Plaintiff/Counterdefendant, | ) |
| | ) |
| vs. | ) Date:    November 30, 2007 |
| | ) Time:    10:00 a.m. |
| PALANTIR.NET, INC., | ) Courtroom 8 |
| | ) |
| Defendant/Counterplaintiff. | ) |

## MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

JOSEPH L. STRABALA, ESQ., SBN 34 832
LAW OFFICES of JOSEPH L. STRABALA
One Embarcadero Center, Suite 1020
San Francisco, CA 94111-3698
Telephone: (415) 981-8083
Facsimile: (415) 398 9663
Email: legal@quantumsi.com


THOMAS D. ROSENWEIN, ESQ.
DON E. GLICKMAN, ESQ.
JAMES A. FLESCH, ESQ.
GORDON, GLICKMAN, FLESCH & ROSENWEIN
140 South Dearborn Street, Suite 404
Chicago, IL 60603
Telephone: (312) 346-1080
Facsimile: (312) 346-3708
Email: trosenwein@lawggf.com

Attorneys for Defendant
PALANTIR.NET, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

PALANTIR TECHNOLOGIES, INC.,

    Plaintiff/Counterdefendant,

    v.

PALANTIR.NET, INC.,

    Defendant/Counterplaintiff.

No. C 07 3863 CRB

## TABLE OF CONTENTS TO MEMORANDUM IN
## SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

I.    Procedural Background ................................................................................................ 1

II.    Factual Background ..................................................................................................... 1

    1.    Organizational Background of Palantir.net ..................................................... 1

    2.    Palantir.net's Trademark Registration ............................................................ 2

    3.    Palantir.net's Clients ....................................................................................... 2

5.    Palantir.net's Growth ................................................................................. 5

6.    Palantir.net's Marketing Channels ............................................................ 6

7.    Palantir.net's Discovery of PTI and Actual Confusion ............................ 7

8.    PTI's Business and Services ...................................................................... 7

9.    "Cease and Desist" and PTI's Response .................................................... 8

10.   PTI's Web-Based Marketing and Disruption of Palantir.net ..................... 9

III.   Argument ................................................................................................................... 10

A.    Standard of Motion for Preliminary Injunctions ............................................ 10

B.    Probability of Success on the Merits .............................................................. 10

1.    Similarities of the Marks .......................................................... 11

2.    Strength of the Mark ................................................................. 12

3.    Proximity of the Goods/Services .............................................. 13

4.    Evidence of Actual Confusion .................................................. 18

5.    Marketing Channels Used ......................................................... 19

6.    Type of Goods and the Degree of Care
      Likely to be Exercised by the Purchaser .................................. 20

7.    Defendant's Intent in Selecting the Mark ................................. 21

8.    Likelihood of Expansion of the Product Lines ......................... 22

C.    Irreparable Harm to Moving Party .................................................................. 23

IV.   Conclusion ................................................................................................................ 24

**JOSEPH L. STRABALA, ESQ.**, SBN 34 832
**LAW OFFICES of JOSEPH L. STRABALA**
One Embarcadero Center, Suite 1020
San Francisco, CA 94111-3698
Telephone: (415) 981-8083
Facsimile: (415) 398 9663
Email: legal@quantumsi.com

**THOMAS D. ROSENWEIN, ESQ.**
**DON E. GLICKMAN, ESQ.**
**JAMES A. FLESCH, ESQ.**
**GORDON, GLICKMAN, FLESCH & ROSENWEIN**
140 South Dearborn Street, Suite 404
Chicago, IL 60603
Telephone: (312) 346-1080
Facsimile: (312) 346-3708
Email: trosenwein@lawggf.com

Attorneys for Defendant
PALANTIR.NET, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

PALANTIR TECHNOLOGIES, INC.,

    Plaintiff/Counterdefendant,

v.

PALANTIR.NET, INC.,

    Defendant/Counterplaintiff.

No. C 07 3863 CRB

## TABLE OF AUTHORITIES TO MEMORANDUM IN
## SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

*Stuhlbarg Intern. Sales Co. v. John D. Brush and Co.,*
   240 F.3d 832, 839-840 (9th Cir. 2001) ................................................ 10

*Overstreet v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506,*
   409 F.3d 1199, 1207 (9th Cir. 2005) ................................................ 10

*GoTo. Com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 n. 4 (9th Cir. 2000)........ 10, 11, 23

*Cleary v. News Corp.,* 30 F.3d 1255, 1262-63 (9th Cir. 1994)................................. 10

*Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000) ................................................. 10

*Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629, 633 (9th Cir. 2007) ............ 10

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979) .................. 11, 12, 20, 22

*Glow Industries, Inc. v. Lopez*, 252 F.Supp.2d 962, 986 (C.D. CA, 2002) ........................... 11

*Dreamwerks Production Group, Inc. v. SKG Studio*,
    142 F.3d 1127, 1130 (9th Cir. 1998) ....................................................................... 11

*Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*,
    198 F.3d 1143, 1146 (9th Cir. 1999) ....................................................................... 12

*Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*,
    601 F.2d 1011, 1014 (9th Cir. 1979) ....................................................................... 12

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
    174 F.3d 1036, 1058 (9th Cir. 1999) ....................................... 12, 13, 17-18, 21, 23

*American Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103 (2nd Cir. 1978)............ 12

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
    59 F.3d 902, 910-11 (9th Cir. 1995) ....................................................................... 13

*Dep't of Parks & Recreation v. Bazaar del Mundo Inc.*,
    448 F.3d 1118, 1124 (9th Cir. 2006) ....................................................................... 13

*E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992) ................... 13

*In re Martin's Famous Pastry Shoppe, Inc.*,
    748 F.2d 1565, 223 USPQ 1289 (Fed. Cir. 1984) ................................................. 14

*In re Corning Glass Works*, 229 USPQ 65 (TTAB 1985) ....................................................... 14

*In re Rexel Inc.*, 223 USPQ 830 (TTAB 1984)........................................................................ 14

*Guardian Products Co., Inc. v. Scott Paper Co.*, 200 USPQ 738 (TTAB 1978) ................... 14

*In re International Telephone & Telegraph Corp.*, 197 USPQ 910 (TTAB 1978) ................ 14

*McCarthy on Trademarks and Unfair Competition* ........................................... 14, 22, 23

*Amcor, Inc. v. Amcor Industries, Inc.*, 210 USPQ 70 (TTAB 1981) ...................................... 14

*Hewlett Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1267-68 (Fed. Cir. 2002) ....... 15

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,*
    846 F.2d 1079, 1089 (7th Cir. 1988) ................................................................. 16

*CAE, Inc. v. Clean Air Engineering, Inc.,* 267 F.3d 660, 680 (7th Cir. 2001) ................. 16, 21

*Planetary Motion, Inc. v. Techsplosion, Inc.* 261 F.3d 1188, (11th Cir. 2001) ............... 17, 22

*Rosenthal A.G. v. Ritelite, Ltd.,* 986 F.Supp. 133, 141 (E.D.N.Y. 1997) ............................ 17

*Cooper v. Revolution Records, Inc.,* 1997 WL 196650, *5 (9th Cir. 1997) ........................... 19

*Academy of Motion Picture Arts,* 944 F.2d 1446, 1456 (9th Cir. 1991) ................................ 19

*Sands, Taylor & Wood v. Quaker Oats Co.,* 978 F.2d 947, 958 (7th Cir. 1992) ............. 19, 22

*Accuride Internaonal, Inc. v Accuride Corp.,* 871 F.2d 1531, 1537 (9th Cir. 1989) ............. 20

*Metro Pub., Ltd. v. San Jose Mercury News,* 987 F.2d 637, 640 (9th Cir. 1993) .................. 24

NOW COMES Defendant, PALANTIR.NET, INC. ("Palantir.net"), by and through its attorneys, Joseph L. Strabala, of the Law Offices of Joseph L. Strabala, and Thomas D. Rosenwein, Don E. Glickman, and James A. Flesch, of Gordon, Glickman, Flesch & Rosenwein, and hereby submits its Memorandum in Support of its Motion for Preliminary Injunction with attached exhibits. In support of its motion, Palantir.net states as follows:

## I.     PROCEDURAL BACKGROUND

PTI preemptively filed its declaratory judgment suit against Palantir.net on July 27, 2007 in the United States District Court for the Northern District of California.

On October 2, 2007, this Court denied Palantir.net's Motion to Dismiss or Stay this action in favor of Palantir.net's infringement suit filed in Illinois on July 20, 2007.   On October 17, 2007, Palantir.net filed its Answer, Affirmative Defenses and Counterclaims. Included in its Counterclaims are trademark infringement actions arising under the Trademark Act of July 5, 1946, as amended, commonly known as the Lanham Act, 15 U.S.C. §1051, *et seq.*, as well as the state and common law claims for unfair competition, based on Palantir.net's status as senior user and federal registrant of the PALANTIR mark.

## II.     FACTUAL BACKGROUND

### 1.   ORGANIZATIONAL BACKGROUND OF PALANTIR.NET

As more fully set forth in the Declarations of George DeMet and Tiffany Farriss (Exhibits "A" and "B"), Palantir.net's predecessor, a sole proprietorship owned by Mr. DeMet under the trade name "Palantir Internet Services," began providing Web site design and development services nationally in connection with the brand "Palantir" in July 1996. Mr. DeMet obtained the domain "palantir.net" in March 1997, and employed a logo on that site

which incorporated the single word "Palantir." In March 1998, Mr. DeMet filed for an assumed business name in Illinois for the purpose of doing business as "Palantir Internet Services." (DeMet Dec., Ex. A, ¶¶3-5)

On May 1, 2000, Mr. DeMet incorporated the company as "Palantir.net, Inc." in the state of Illinois, a corporation jointly owned by Mr. DeMet and Ms. Farriss. All Palantir Internet Services' assets, clients, and intellectual property, including the brand "Palantir," the domain palantir.net and its Web site, were transferred to Planantir.net. (DeMet Dec., Ex. A, ¶6; Farriss Dec., Ex. B, ¶¶6-7)

## 2.    <u>Palantir.net's Trademark Registration</u>

In April of 2002, Palantir.net applied for federal service mark for the term "PALANTIR" in connection with its computer services, described as "designing and hosting network web sites for others, designing database software for others, designing multimedia software for others, and design in the field of multimedia presentations for others," which was assigned Serial No. 76399465. The application was published for opposition on November 8, 2005, and registered on January 31, 2006, as Reg. No. 3052005. (DeMet Dec., Ex. A, ¶8; Farriss Dec., Ex. B, ¶9; Ex. C)

## 3.    <u>Palantir.net's Clients</u>

Palantir.net's direct client base includes a number of educational institutions (e.g., Columbia College Chicago, DePaul University, Northwestern University, School of the Art Institute of Chicago, University of Chicago Law School, University of Denver, Washington University in St. Louis, and Chicago Public Schools), cultural institutions (e.g., the Art Institute of Chicago and the Indianapolis Museum of Art), financial and corporate clients (e.g.,

2

M3 Capital Partners, LLC, First Bank & Trust, Maine Plastics, Inc., and Rubloff Residential Properties), and nonprofit and professional organizations, (e.g., the Associated Colleges of Illinois, the Great Lakes Protection Fund, the Illinois Supreme Court Commission on Professionalism, Presbyterian Homes, Ragdale Foundation, the Sisters of the Sorrowful Mother, AIGA Chicago, the Kane County Bar Association, the National Association of Bar Executives, and the Urban Libraries Council.)  (DeMet Dec., Ex. A, ¶12; Farris Dec., Ex. B, ¶¶8, 10-12)

In addition, Palantir.net works in collaboration with partners who retain the firm to consult on, manage and/or implement technical solutions for which such partners lack the in-house expertise.  These partners include Brainforest, Inc., SGDP, Crosby Associates, Faust, Ltd., Froeter Design Company, Inc., Lipman Hearne, LOWERCASE, Inc., Neiger Design, Inc., Petrick Design, SGDP, and Studio Blue, Inc. (DeMet Dec., Ex. A, ¶13; Farriss Dec., Ex. B, ¶14)

In collaboration with these and other firms, Palantir.net has also worked on projects for a number of current and former Fortune 500 corporations, including Allstate, Ariba, Fluor Federal Services, Motorola, and Baxter International, as well as the Federal Emergency Management Agency, United Airlines, and financial services sector clients Order Execution Services, Thoma Cressey Bravo and Townsend Analytics. (DeMet Dec., Ex. A, ¶¶13-14; Farriss Dec. Ex. B, ¶14)

## 4.  Palantir.net's Services

Following incorporation and the hiring of additional full-time employees in 2000, Palantir.net began offering more complex database and multimedia software development services.  Its staff included programming and database specialists experienced in working with Javascript, Perl, PHP, C, C++, Java, Visual Basic, Microsoft SQLServer and MySQL.  Since at

3

least the spring of 2003, Palantir.net consistently offered and advertised database applications among its services on its public Web site. (DeMet Dec., Ex. A, ¶7)

In addition to a number of standalone and CMS-backed Web sites that it has created, Palantir.net has been involved in developing diverse database application projects, which include:

- A database application used by the Federal Emergency Management Agency ("FEMA") to manage reports submitted by Department of Homeland Security contractors operating on a $100 million technical assistance contract.
- A database application designed to allow a Department of Homeland Security contractor to rapidly identify available resources for deployment through FEMA and track those personnel.
- A software platform for member-based organizations that allows them to manage their Web site, membership database, promote upcoming events, and sell products online.
- A completely custom end-to-end inventory, customer management, and order fulfillment system for a greeting card company.
- A database application for a real estate firm that allows them to track the success of different print-based ad campaigns and customize their advertising accordingly.
- A Web site for the same real estate firm that collates data from a number of different multiple listing services and offers a variety of consolidated search and results options.
- An award-winning educational program that includes a hybrid multimedia application for Microsoft Windows and Apple Macintosh PCs, a Web site, and a backend database application that tracks data for thousands of student and parent participants at several of the largest school districts in the United States.
- An order procurement system backed by a searchable online database that manages purchase order requests for several academic departments at Northwestern University.
- Room and Equipment Scheduling Software for an academic department at Northwestern University.
- A standalone custom point-of-sale application to manage information about a hotel's customers and rewards program.
- A database application designed to allow a global real estate investment banking and advisory firm the ability to organize and display completed transactions on their Web site by transaction type, market sector, and date.
- A database system designed to automatically schedule and allocate docent resources for educational programs at the Museum of the Art Institute of Chicago.
- A custom-developed Web site content management system used by a variety of clients in the corporate, academic, institutional, and non-profit sectors.

4

MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

CASE NO. C 07 3863

- A repository that allows board members of an environmental endowment fund overseen by several state governors to access organizational and financial documents.

(DeMet Dec., Ex. A, ¶15)

Palantir prices its projects based on an hourly rate, which ranges from $125 – $250 per hour depending on the client, personnel involved and skill set required. Its project deliverables include:

- Web sites
- Content management system integrations
- Web-based applications
- Database integrations
- Stand alone desktop applications – multimedia, point-of-sale and data entry
- Consulting: usability, interface design, heuristic evaluations, business process, database model
- Training and documentation

Palantir.net's projects can be roughly categorized on a per cost basis: small (under $25,000), medium ($25-100k) and large ($100k+). The bulk of Palantir's project work is on medium sized projects, with generally one or two "large" projects per year. Palantir.net is typically invited to bid on projects through the strength of its reputation, which is the primary source for attracting new clients. (Farriss Dec. Ex. B, ¶¶16-17)

## 5.   **Palantir.net's Growth**

In 2000, Palantir.net had 4 full-time employees. At present, Palantir.net has 11 full-time employees, in addition to a number of part-time and freelance resources that are brought in on a per-project basis, including employees based in Colorado and Arizona. Freelancers are recruited from around the nation. (DeMet Dec., Ex. A, ¶¶9-11; Farriss Dec. Ex. B, ¶8)

In addition to its growth in personnel (nearly tripling from 2000 to 2007), Palantir.net has grown its revenues and client base each year. For example, in 2004 its revenues increased 82%

5

over the prior year, and new clients included Hagerty Consulting (including projects for FEMA), Evanston Community Foundation, and the University of Chicago.   In 2005, its revenues increased 13% over the prior year, and it began working with the Art Institute of Chicago, Associated Colleges of Illinois, Urban Libraries Council and Sisters of the Sorrowful Mother.  In 2006, revenues increased 59% over the prior year, and it began working with the School of the Art Institute, DePaul University, Harris Theater of Music and Dance, Washington University in St. Louis, and M3 Capital Partners as new clients.  In year-to-date 2007, Palantir.net's revenues have increased 30% over the prior year, with year-end projections indicating growth of 94%, and new clients include Columbia College Chicago, University of Denver, and First Bank and Trust. In collaboration with its design partners, Palantir.net also began work for Thoma Cressey Bravo, Chicago Partners, Order Execution Services, and Baxter Healthcare.  (Farriss Dec. Ex. B, ¶¶10-15)

Palantir.net's growth has come without the aid of investors or outside capital. Palantir.net has a "bootstrap" growth philosophy that emphasizes internal development and resource allocation as opposed to obtaining external investors.  As a result, ownership has remained constant since 2000.  (DeMet Dec., Ex. A, ¶10; Farriss Dec., Ex. B, ¶15)

**6.    Palantir.net's Marketing Channels**

Palantir.net's project successes are promoted through the Web – via its own Web site, other Web sites, Internet listservs, as well as publications of relevance to project and award competitions.   Attendance at industry conferences and events also provides a means of networking and publicizing the company.  One key to Palantir.net's success is that it survived and grew during the period of the "dot com mania" collapse in 2000 and 2001.  Its relative

6

longevity in a field known for high turnover is an important part of its identity and appeal to clients. (DeMet Dec., Ex. A, ¶¶21-23; Farriss Dec. Ex. B, ¶19)

### 7.    Palantir.net's Discovery of PTI and Actual Confusion

In late January or early February of 2007, one of Palantir.net's employees, Nick Disbato, noticed an ad for an "Interaction Designer" posted on the 37signals job board (accessible at http://jobs.37signals.com/) by a company using the designation "Palantir." Mr. Disbato had himself been hired by in the summer of 2006 by Palantir.net through a job posting placed on that same Internet board (a service which describes itself as the place used by major companies to find "today's best and brightest web minds"). Mr. Disbato commented to Palantir.net's owners that he had noticed that "we were hiring there again." Knowing that no one at Palantir.net had commissioned an advertisement for the 37signals job board, Ms. Farriss and Mr. DeMet reviewed the advertisement and discovered that it was in fact an ad placed by PTI for an Interaction Designer, with a job description very similar to the kind of position that Palantir.net would offer. That was Palantir.net's first discovery of the existence of PTI. (DeMet Dec., Ex. A, ¶16)

### 8.    PTI's Business and Services

Upon a review of PTI's Web site, Palantir.net's principals observed that PTI, a "software startup," was in the business of designing database software for others, as evidenced by their description of their product as an "analytical platform" and other references on their Web site to "building enterprise class software," and "building custom database code," as well as the fact that they were hiring interaction designers and software engineers. However, other than its website, there was no indication that PTI had launched a marketing campaign to advertise its

7

presence and offerings as yet.  PTI describes itself currently in the same terms, adding that it is engaged in "information analysis" based upon its "technology."  Among the categories of employees it is currently seeking to hire are "software engineer, quality assurance engineer, release engineer, client services engineer and Unix systems engineer" as well as an "interaction designer."  (DeMet Dec., Ex. A, ¶¶17; Ex. D)

Further information regarding PTI was obtained in April 2007, when a number of Palantir.net employees, including Ms. Farriss, Mr. DeMet and another employee of Palantir.net, Colleen Carroll, attended UX Intensive, a four-day workshop sponsored by Adaptive Path, and targeted at interaction designers.  There, the Palantir.net employees were approached by one of the attendees, who noticed that their nametags said, "Palantir.net, Inc."  In another instance of actual confusion, that attendee stated, "Oh, I interviewed with you out in San Francisco."  Upon being informed that Palantir.net did not have an office in San Francisco, it was revealed that the company that he interviewed with was in fact PTI.  That attendee confirmed that PTI was involved in designing database software to assist government agencies and others with data profiling.  He also advised that PTI was a company funded by venture capital.  (DeMet Dec., Ex. A, ¶22)

## 9.    "Cease and Desist" and PTI's Response

On February 19, 2007, counsel for Palantir.net wrote to the registered agent for PTI, stating that its adoption and use of the term "Palantir" was likely to cause confusion for consumers, and was in violation of Palantir's intellectual property rights.  As a result, Palantir demanded that PTI "forthwith cease and desist use of 'Palantir' in its trade name and as a brand in all advertising, promotion, and displays of [its] company's services in whatever media," and

8

suggesting that at its early stage of development, PTI would not be inconvenienced by selecting a new trade name and brand. (DeMet Dec., Ex. A, ¶19; Ex. E)

Two days later, PTI filed its intent-to-use federal trademark application for "Palantir" in the United States Patent and Trademark Office.  It described its services as "information and data management and exploration; namely the collection, editing, analysis, viewing, organization, modification, book marking, transmission, storage, exchange, sharing, querying, auditing, and tracking of data and information."  PTI did not disclose that it was in fact offering computer software services.  PTI has neither abandoned its intent-to-use application nor amended its description of services. (Ex. F)

**10.  PTI's Web-Based Marketing and Disruption of Palantir.net**

During the summer of 2007, the principals of Palantir.net discovered that PTI had begun using Google's AdWords service to pay for sponsored search results for the word "Palantir" on Google and other Web sites.  Prior to this time, the Palantir.net Web site had been one of the highest ranked results for a search for the word "Palantir" on Google, while PTI's Web site had not even appeared in the first page of results.  While Palantir.net's Web site remained ranked above PTI's for several months, by September of 2007, PTI's Web site now appeared above Palantir.net's entry on a Google search.  Search engine placement is an important part of Palantir.net's marketing efforts.  Palantir.net has spent years working to ensure that its Web site was well-represented in Google's search results.  PTI's aggressive advertising on the Web made Palantir.net's Web site more difficult to find and has made it more likely that users will confuse PTI's Web site for Palantir.net's website.  Continued aggressive advertising by PTI on the Web makes it likely that PTI, although the junior use of the term "Palantir," will be perceived as the

9

first user of the mark, thereby resulting in "reverse confusion" to the detriment of Palantir.net. (DeMet Dec., Ex. A, ¶¶20-21, 24)

### III.    ARGUMENT

#### A.    Standard for Motion for Preliminary Injunctions

The standard for obtaining a preliminary injunction is well established.  A preliminary injunction should issue if the moving party establishes either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party. *Stuhlbarg Intern. Sales Co. v. John D. Brush and Co.*, 240 F.3d 832, 839-840 (9th Cir. 2001).  Accord, *Overstreet v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*, 409 F.3d 1199, 1207 (9th Cir. 2005) (for a preliminary injunction to issue, "a moving party must show either a combination of probable success on the merits and the possibility of irreparable harm or serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits.")  Moreover, in trademark cases, "irreparable injury may be presumed from a showing of likelihood of success on the merits." *GoTo. Com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 n. 4 (9th Cir. 2000).

#### B.    Probability of Success on the Merits

The test for trademark infringement under federal, state, and common law is whether there will be a likelihood of confusion. *See Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994); *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000) ("The test for false designation under the Lanham Act, as well as the common-law and statutory unfair competition claims, is whether there was a 'likelihood of confusion.'"); *Abercrombie & Fitch Co. v. Moose*

10

*Creek, Inc.*, 486 F.3d 629, 633 (9th Cir. 2007) ("[t]he core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products.")

To determine infringement, eight nonexclusive factors are evaluated to determine likelihood of confusion. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). The factors are: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. (*Id.*). Of course, a court need not address all of the factors, nor must plaintiff establish that each weighs in its favor in order to establish a likelihood of confusion. *Glow Industries, Inc. v. Lopez*, 252 F.Supp.2d 962, 986 (C.D. CA, 2002). While the first three factors are especially relevant in circumstances such as these, where reverse confusion is at issue, *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998), the most critical factor in the analysis has always held to be the similarity of the marks. *GoTo.com*, supra, 202 F.3d at 1205. Accordingly, we begin with a consideration of that factor.

### 1.    Similarities of the Marks

This factor weighs entirely in favor of Palantir.net. PTI is claiming rights to use the identical mark PALANTIR that Palantir.net has used for years prior to PTI's claimed use, and for which Palantir.net owns a federal registration. On this most critical factor, there is simply no way to dispute the complete identity. Indeed, PTI has filed a federal trademark application for

11

the identical term "Palantir," thereby confirming its intent to use the identical mark owned by Palantir.net.

### 2.    Strength of the Mark

This factor also weighs heavily in favor of Palantir.net.  The strength of marks is based on four categories:   (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999) (citing *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979)).  A generic term refers to the type or species of the product at issue.  (*Id.* at 1147).  Generic terms are so "weak" that they cannot be protected as trademarks.  (*Id.*).  Descriptive terms "generally do not enjoy trademark protection" but may be protected if they acquire 'secondary meaning' in the minds of consumers, i.e., [they] become distinctive of the trademark applicant's goods in commerce.'"  (*Id.*).  However, marks that are suggestive, arbitrary or fanciful can be protected without demonstrating secondary meaning.  *See, AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir.1979).  A term is suggestive if it "conveys an impression of a good but requires the exercise of some imagination and perception to reach a conclusion as to the product's nature." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999), citing *American Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103 (2nd Cir. 1978) ("Roach Motel" insect trap is suggestive mark).

PALANTIR, as used in connection with the services offered by Palantir.net, is clearly suggestive.  The reference is to a magical device in the nature of a crystal ball that not only enables a user to see all over the world but also enables communication by a user to others using

12

similar devices. In the vision of the founders of Palantir.net, it is a more encompassing metaphor for communication in the age of computers and the Internet than the notion of the more prosaic "information superhighway." Because "Palantir" is a suggestive mark, it is deemed to be a "strong" mark. *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910-11 (9th Cir.1995); *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999) (mark suggestive when it requires "a mental leap from the mark to the product").

Moreover, the United States Patent and Trademark Office clearly thought so, as the mark was federally registered to Palantir.net without proof of secondary meaning as would be required for a "merely descriptive" mark. As this Court is well aware, federal registration "constitutes prima facie evidence of the validity of the registered mark and of [the registrant's] exclusive right to use the mark" in commerce. *Brookfield Communications, Inc. v. W. Coast Entm't Corp.*, supra, at 1047; *Dep't of Parks & Recreation v. Bazaar del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006).

Thus, the factor of strength of the mark weighs heavily in Palantir.net's favor.

3.    Proximity of the Goods/Services

The degree of competition and relatedness of the two users' goods or services is the third key factor in the analysis of likelihood of confusion. The danger of consumer confusion is enhanced when goods are related or complementary. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir.1992). The goods and services of the parties need not be identical or directly competitive to find a likelihood of confusion. They need only be related in some manner, or the conditions surrounding their marketing be such, that they could be encountered by

13

the same purchasers under circumstances that could give rise to the mistaken belief that the goods come from a common source. *In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289 (Fed. Cir. 1984); *In re Corning Glass Works*, 229 USPQ 65 (TTAB 1985); *In re Rexel Inc.*, 223 USPQ 830 (TTAB 1984); *Guardian Products Co., Inc. v. Scott Paper Co.*, 200 USPQ 738 (TTAB 1978); *In re International Telephone & Telegraph Corp.*, 197 USPQ 910 (TTAB 1978). Moreover, if the marks of the respective parties are identical, the relationship between the goods or services of the respective parties need not be as close to support a finding of likelihood of confusion as might apply where differences exist between the marks. *See, McCarthy on Trademarks,*, ¶11:76 ("Whether a mark is weak or not is of little importance where the conflicting mark is identical and the goods are closely related.") Accord, *Amcor, Inc. v. Amcor Industries, Inc.*, 210 USPQ 70 (TTAB 1981). As noted above, the marks of the parties here are identical.

Palantir.net has registered the PALANTIR mark in connection with services for "designing and hosting network web sites for others, designing database software for others, designing multimedia software for others, and design in the field of multimedia presentations for others." In practical terms, this translates to providing services that involve the creation and management of Web sites, content management system integrations, provision of Web-based software applications, database integrations, stand alone desktop software applications as well as multimedia, point-of-sale and data entry software applications. (Ex. B, ¶16)

PTI intends to use the mark in the same or highly related fields. In its complaint, PTI makes reference to its "software" services in similar terms. For example, PTI grandly describes itself thus: "PTI's software and services provide its customers the ability to explore, understand,

MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

CASE NO. C 07 3863

manipulate, and share large sets of structured and unstructured information across departmental and organizational lines. PTI accomplishes this monumental task by bringing together data from investigations, spreadsheets, documents, XML files, and hundreds of other formats, enabling analysts to organize date into knowledge and allow its users to make connections utilizing a number of different user interfaces." (Complaint for Dec. J, ¶9)

On its website, PTI describes itself as a "software startup" in the business of designing database management software for others, as evidenced by its description of technology as an "analytical platform" that is used for "information analysis." A further sense of its activities can be gleaned from the categories of employees it is currently seeking to hire, which include "software engineer, quality assurance engineer, release engineer, client services engineer, Unix systems engineer" and "interaction designer."[1]   (Ex. "D"). Thus, PTI is engaged in designing database software, which is precisely what Palantir.net describes in its registration certificate and precisely what, in part, it does. To the extent PTI's services can be described as providing information processing services, such services are identical to Palantir.net's database applications that allow a user to identify and coordinate discrete items of information and data.[2]

On point is *Hewlett Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1267-68 (Fed. Cir. 2002). There, the court found that the trademark owner's registration for HEWLETT

---

[1] In his affidavit submitted in support of PTI's motion to dismiss or transfer the case pending in the Northern District of Illinois, and in the context of seeking to avoid Illinois as a venue, Alexander Karp, the CEO of PTI, describes his company as being in the software business: "The offering of PTI's services, sale, design, production, and distribution of PTI's software, and the design and production of PTI's marketing materials and campaign emanate and are located in California either in large part of in their entirety." (Ex. G, ¶ 21)

[2] In April 2007, a conference attendee confirmed to employees of Palantir.net, including its principals, that PTI was involved in designing database software to assist government agencies and others with data analysis. (DeMet Dec., Ex. A, ¶22)

15

PACKARD for use in connection with "consultation services in the field of computer, electronic, signalling [sic], measuring, data processing, analytical, and medical products" was "closely related" to the junior user's PACKARD TECHNOLOGIES mark for "data and information processing" services.   The court also found that the trademark owner's registration for HEWLETT PACKARD for "programs for information manipulation and apparatus for data acquisition and processing' was "closely related" to the junior user's intent to use application of PACKARD TECHNOLOGIES for services described as "conversion from one media form to another media."  Based on such relatedness, the Federal Circuit held that "consumers may well find the goods and services of the parties related enough to make confusion likely."

Of course, likelihood of confusion exists even when the goods or services are not identical or even closely related but instead are "sufficiently related" to create an inference in consumers' minds that the products came from the same source. *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1089 (7th Cir. 1988).

This point is amplified in *CAE, Inc. v. Clean Air Engineering, Inc.,* 267 F.3d 660, 680 (7th Cir. 2001) (finding likelihood of confusion where two parties "offer some of the same basic technology and, in some instances, serve the same companies and the same industries.")  The CAE court further noted that even if many of the products and services offered by the parties are "quite different," such dissimilarity is not dispositive of the likelihood of confusion inquiry.

> A likelihood of confusion may exist even if the parties are not in direct competition, or their products and services are not identical. Rather, because the rights of an owner of a registered trademark extend to any goods that might be, in the minds of consumers, "related," i.e., put out by a single producer, the more accurate inquiry is whether the public is likely to attribute the products and services to a single source. "Closely related" products are those that "would reasonably be thought by the buying public

16

to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." [citations omitted] (at 684)

Here, PTI and Palantir.net serve the same industries. PTI boasts on its website of offering products to "government agencies" and to "the financial world." (Ex. "D"). As noted above, Palantir.net has provided services to FEMA, a federal governmental agency, as well as to financial firms such as M3 Capital Partners and First Bank & Trust. (Farriss Dec., Ex. B, ¶¶10, 12, 14; DeMet Dec., Ex. A, ¶¶12-14)

*Accord, Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, (11th Cir. 2001) ("We find that the relatedness between e-mail notification software and a service that allows users to check e-mail via telephone line is not so attenuated that the district court mistakenly failed to limit Planetary Motion's rights in the mark to its use in connection with the software.")

*See*, also, *Rosenthal A.G. v. Ritelite, Ltd.*, 986 F.Supp. 133, 141 (E.D.N.Y. 1997) ("[A]bsent equities in a defendant's favor, courts should enjoin defendants 'from using a similar trademark whenever the non-competitive products are sufficiently related that customers are likely to confuse the source of origin.'")

Clearly, the relatedness of the services offered by Palantir.net and PTI weigh heavily in favor of Palantir.net.

As the three most important factors all strongly favor Palantir.net, the Ninth Circuit's decision in *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, supra, is controlling. There, the court considered the likelihood of confusion between two firms, one using the domain "moviebuff.com" in connection with providing information regarding movies, and the other using "MovieBuff" in connection with the renting and selling of videotapes. In reversing the denial of a preliminary injunction to the owner of "moviebuff.com," the Ninth

17

Circuit held that an emphasis on "principal lines of business" was error. Rather, the focus should be on "whether the consuming public is likely somehow to associate West Coast's products [MovieBuff] with Brookfield [moviebuff.com]:

> Here, both companies offer products and services relating to the entertainment industry generally, and their principal lines of business both relate to movies specifically and are not as different as guns and toys [citation], or computer circuit boards and the Rocky Horror Picture Show [citation].

The *Brookfield* court concluded that "[g]iven the virtual identity of "moviebuff.com" and "MovieBuff," the relatedness of the products and services accompanied by those marks, and the companies' simultaneous use of the Web as a marketing and advertising tool, many forms of consumer confusion are likely to result." (at 1057)

Palantir.net submits that the same result should be obtained here. The marks are identical, Palantir.net's mark is at least suggestive, the services and products offered are closely related and both use the Web as a marketing and advertising tool. The likelihood of Palantir.net's success on the merits is therefore highly probable, and a preliminary injunction should issue.

Notwithstanding the above, and for purposes of completeness, we turn to a consideration of the remaining factors.

4.     Evidence of Actual Confusion

Although PTI is in a start-up mode, there nonetheless have been instances of actual confusion among sophisticated job seekers. As identified above, the first instance of confusion occurred in late January or early February of 2007, when one of Palantir.net's employees noticed an ad for an "Interaction Designer" posted at http://jobs.37signals.com/ by a company using the

MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

CASE NO. C 07 3863

designation "Palantir." That employee commented to Palantir.net's owners that he had noticed that "we were hiring there again." (DeMet Dec., Ex. A, ¶16)

Similarly, in April 2007, at a UX Intensive, a four-day workshop sponsored by Adaptive Path, and targeted at interaction designers, the three Palantir.net employees attending the conference were approached by another the attendees. Upon noticing that their nametags said, "Palantir.net, Inc," that attendee stated, "Oh, I interviewed with you out in San Francisco." Upon being informed that Palantir.net did not have an office in San Francisco, it was revealed that the company that he interviewed with was in fact PTI. (DeMet Dec., Ex. A, ¶22)

Of course, it is not necessary that a plaintiff show actual confusion to obtain a preliminary injunction in this circuit. *See Cooper v. Revolution Records, Inc.,* 1997 WL 196650, *5 (9th Cir. 1997), citing *Academy of Motion Picture Arts,* 944 F.2d 1446, 1456 (9th Cir. 1991). This is the rule in other circuits as well. See, *Sands, Taylor & Wood,* 978 F.2d at 960 ("As we have stated many times ...the plaintiff need not show actual confusion in order to establish likelihood of confusion.") However, and remarkably, here there is evidence of actual confusion, and by persons who are trained engineers and motivated job seekers. This evidence thus weighs heavily in Palantir.net's favor.

5.     Marketing Channels Used

As described above, both Palantir.net and PTI utilize the Web as their primary marketing tool. Palantir.net has learned that PTI is employing Google's AdWords service to pay for sponsored search results for the word "Palantir" on Google and other Web sites, a marketing effort that now displaces Palantir.net from its high rankings for search results. Palantir.net has spent years working to ensure that its Web site was well-represented in Google's search results.

MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

CASE NO. C 07 3863

PTI's aggressive advertising on the Web made Palantir.net's Web site more difficult to find and has made it more likely that users will confuse PTI's website for Palantir.net's site. (DeMet Dec., Ex. A, ¶¶20, 24)

Because they share the same marketing channel, this factor also weighs heavily in favor of Palantir.net.

6.    Type of Goods and the Degree of Care Likely to be Exercised by the Purchaser

The services offered by both parties are not inexpensive.  Certainly, Palantir.net's services are not inexpensive, and we presume for purposes of this motion that PTI's services are also not inexpensive.  Such expense is often viewed as lessening the likelihood of confusion under this factor. See, e.g., *Accuride Internaonal, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1537 (9th Cir. 1989).  However, price is not the only factor to be considered.  As stated in *AMF, Inc. v. Sleekcraft*, supra, at 353: "The care exercised by the typical purchaser, though it might virtually eliminate mistaken purchases, does not guarantee that confusion as to association or sponsorship is unlikely."

Moreover, as the *Sleekcraft* court stated, "the hallmark of a trademark owner's interest in preventing use of his mark on related goods is the threat such use poses to the reputation of his own goods. ...The wrong inheres in involuntarily entrusting one's business reputation to another business." (Id. at 353-54).  Even if PTI's software services function as advertised, there may well be consumers who, believing that there is a connection or affiliation between the parties, may decide not to use any services from a company known as "Palantir" because of a belief that PTI's information mining services offend notions of privacy, thereby condemning Palantir.net by association without the benefit of even contacting it first.

20

MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

CASE NO. C 07 3863

The court's observation in *CAE, Inc. v. Clean Air Engineering, Inc., supra*, is also relevant here.   The CAE court stated that "although many of the parties' customers are sophisticated and decide to buy only after extensive negotiations, these customers' technical sophistication about their particular industry does not equate to trademark sophistication."   The court found that the overlap in the parties' technologies "makes it more likely that even an informed and sophisticated consumer will mistakenly attribute the parties' products and services to a common source.   The potential for such mistakes is heightened by the difficulty of determining which [accused infringer] entity belongs to which party without some prior knowledge of each party's corporate structure."

Thus, while the cost of services themselves may not a first blush favor a likelihood of confusion finding, such cost does not negate the likelihood of confusion as to affiliation or sponsorship.  At worst, this factor is neutral in the likelihood of confusion analysis.  As noted in *Brookfield Communications, Inc. v. West Coast Entertainment Corp., supra*, in language entirely appropriate here:  "We need not, however, decide this question now because the purchase confusion factor, even considered in the light most favorable to West Coast, is not sufficient to overcome the likelihood of confusion strongly established by the other factors we have analyzed." (at 1060)

7.    Defendant's Intent in Selecting the Mark

This factor favors the senior user of the mark "where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark."  *Brookfield Communications, Inc. v. West Coast Entertainment Corp., supra*, at 1059.  As noted above, Palantir.net filed its use-based application for federal registration in April 2002, well before

21

PTI's admitted incorporation "in 2004." (Ex. C; Ex. G, ¶3). Thus, PTI had at least constructive knowledge of Palantir.net's use of "Palantir" as a brand prior to its incorporation as federal trademark applications can be and routinely are searched prior to an applicant's filing. Thus, this factor weighs in favor of Palanatir.net, regardless of any protestations of PTI's behalf that it did not intend to deceive or confuse. *See*, 3 *McCarthy* § 23:107, at 23-248 to 23-251 (explaining that proof of intent to deceive or to confuse is not necessary to prove trademark infringement).

>   8.   Likelihood of Expansion of the Product Lines

This factor also weighs heavily in favor of Palantir.net. Courts have long recognized that an important reason to protect trademark owners against the use of similar marks on closely related products is "to protect the owner's ability to enter product markets in which it does not now trade but into which it might reasonably be expected to expand in the future." *See*, e.g., *Sands, Taylor & Wood v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir. 1992). The Lanham Act aims to protect "the trademark owner's interest in capitalizing on the good will associated with its mark by moving into new markets." (*Id.*).

In *Sleekcraft, supra*, the court held that a "'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing," citing the Restatement of Torts 731(b) & Comment c. The *Sleekcraft* court further found that "when goods are closely related, any expansion is likely to result in direct competition."

*See*, also, *Planetary Motion, Inc. v. Techsplosion, Inc., supra*, holding that "the scope of protection enjoyed by a trademark owner is not restricted to the owner's original use," and

22

noting that even the owner of a common law trademark "may use its mark on related products or services and may enjoin a junior user's use of the mark on such related uses."

*Accord*, J. McCarthy, § 24:6, (a trademark owner has "protection against use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner.")

This same protection is warranted here, as Palantir.net has been involved in the database software business, currently markets its products and services to governmental agencies and financial entities concerned with managing large quantities of data, and competes with companies who offer similar services. Under these circumstances, there is a convergence of the technologies of Palantir.net and PTI, as well as a customer affinity between their products and services, that is likely to increase consumer confusion if both parties market their products and services in connection with the same "Palantir" mark.

Accordingly, this last factor weighs in favor of Palantir.net.

In sum, on the issue of likelihood of success on the merits, at least seven of the eight *Sleekcraft* factors strongly favor Palantir.net. It is therefore at least "probable" that Palantir.net, the senior user of the PALANTIR mark, will succeed at trial on its claims for trademark competition and unfair competition.

## C.    Irreparable Harm to Moving Party

From a showing of likelihood of success on the merits, the presumption of irreparable injury flows. *GoTo.com*, 202 F.3d at 1209. This has long been the rule in this Circuit. *See*, *Brookfield, supra*, at 1066: "irreparable injury may be presumed from a showing of likelihood of

23

success on the merits of a trademark infringement claim," citing *Metro Pub., Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir. 1993) ("Once the plaintiff has demonstrated a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted.")

Of course, irreparable harm is shown here in any event. Without a preliminary injunction, PTI threatens to overwhelm Palantir.net in the marketplace. Its use of Google AdWords has already resulted in a subordinate placement of Palantir.net on searches. PTI has already sold its services to a financial services company, Clarium Capital Management, LLC, and is thus admittedly already competing in the same sector at Palantir.net.[3] There have already been instances of confusion even among motivated job seekers and trained professionals in software development. The likelihood of confusion that continued use of "Palantir" will occasion constitutes the irreparable harm that will occur if a preliminary injunction is not issued.

## IV.    CONCLUSION

For the reasons set forth above, Palantir.net respectfully requests that the Court enter a preliminary injunction that bars Plaintiff PTI from imitating, copying, duplicating or otherwise making use of Palantir.net's service mark PALANTIR®, or any mark confusingly similar to such mark, during the pendency of this litigation.

Dated this October 26, 2007

---

[3] PTI's C.E.O. has stated that the first sale made by PTI was to "Clarium Capital Management, LLC." (Ex. G, ¶22) Clarium Capital Management, LLC is a "macro hedge fund." (Ex. H)

24

**GORDON, GLICKMAN, FLESCH & ROSENWEIN**

By: _____
Thomas D. Rosenwein
(Admitted Pro Hac Vice)

**THOMAS D. ROSENWEIN**
**DON E. GLICKMAN**
**JAMES A. FLESCH**
**GORDON, GLICKMAN, FLESCH & ROSENWEIN**
140 South Dearborn Street, Suite 404
Chicago, IL 60603
Telephone: (312) 346-1080
Facsimile: (312) 346-3708
Email: trosenwein@lawggf.com

and

**JOE STRABALA LAW OFFICE**

**JOSEPH L. STRABALA**
One Embarcadero Center, Suite 1020
San Francisco, CA 94111-3698
Telephone: (415) 981-8083
Facsimile: (415) 495-3351
Email: jslaw@pacbell.net
State Bar No. 34832

Attorneys for Defendant
PALANTIR.NET, INC.

25