IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PALANTIR TECHNOLOGIES INC., | No. C 07-03863 CRB |
| Plaintiff, | **MEMORANDUM AND ORDER GRANTING MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| PALANTIR.NET, INC., | |
| Defendant. | |

Palantir.net alleges that Palantir Technologies, Inc. ("PTI") infringes Palantir.net's "palantir" trademark. Now pending is Palantir.net's motion for a preliminary injunction.

### FACTUAL BACKGROUND

A palantir is a magical artifact from the *Lord of the Rings* trilogy. It is a stone that functions somewhat like a crystal ball; when one looks in it, one can communicate with other Stones and anyone who might be looking into them. People of great power can manipulate the Stones to see virtually any part of the world.

Palantir.net's predecessor began providing Internet site design and development services nationally under the Palantir name in 1996. The domain name "palantir.net" was acquired in 1997. Palantir.net was incorporated in 2000, and in April 2002, Palantir.net applied for a federal service mark for the term "Palantir." The registration was issued on January 31, 2006.

1    Palantir.net's clients include educational and cultural institutions, as well as financial
2 and corporate clients and nonprofit and professional organizations.  It also works on projects
3 for Fortune 500 companies as well as Federal Emergency Management Administration
4 (FEMA).  In addition to web design, Palantir.net, which now has 11 full-time employees plus
5 free lancers, offers complex database and multimedia software development services.  For
6 example, it designed a database application that FEMA used to manage reports submitted by
7 Department of Homeland Security contractors; a software platform for member-based
8 organizations that allows them to manage their web site, membership database, promote
9 upcoming events, and sell products online; and a standalone custom point-of-sale application
10 to manage information about a hotel's customers and rewards program.
11    In early 2007 one of Palantir.net's employees viewed a job advertisement posted by a
12 company identifying itself as Palantir.  The job was posted on the 37signals job board which
13 describes itself as a place to find the "best and brightest web minds."  The employee asked
14 management about the advertisement; when management looked into the matter they
15 discovered the posting was placed by PTI; that is the first time Palantir.net learned of PTI.
16 Palantir.net reviewed PTI's website and determined that PTI was involved in designing
17 database software for others and hiring interaction designers and software engineers, the
18 same as Palantir.net.
19    Palantir.net also discovered that PTI had begun using Google's AdWords service to
20 pay for sponsored search results for the word "palantir" on Google.  When one now types
21 "palantir" into Google, the first entry is for PTI's website, the second is for the Wikipedia
22 entry for palantir, and the third is for Palantir.net.
23    PTI was created in 2004.  Its website describes its two products, Palantir Government
24 and Palantir Financial, as "revolutionizing information analysis and management, providing
25 superior human-driven systems to explore and analyze the subtle connections that exist
26 within vast networks of heterogeneous information."  PTI is a start up with few clients; it
27 first started offering products under the Palantir name in the fall of 2005.  It is working with
28 //

2

one client, Clarium Capital Management LLC as it develops its Palantir Financial product, and it has a contract with the CIA for its Palantir Government product.

PTI admits that it "customizes" its software products for clients, but denies that it is in the business of developing customized software for clients, as is Palantir.net. PTI describes Palantir.net's business as designing software that creates databases that are then filled or "populated" with the client's data, whereas PTI uses its existing software (slightly modified for each client) to access data from diverse sources and assist the user in drawing connections between that data. For example, Palantir Government "might be used to assist the client in identifying a particular telephone number as a telephone number used by the target of an investigation."

## PROCEDURAL HISTORY

Soon after Palantir.net learned of PTI it sent a cease and desist letter. The parties engaged in talks, but in July 2007 PTI filed this declaratory judgment action seeking a ruling that it does not infringe Palantir.net's trademark. PTI sought to transfer this case to Illinois, but the Court denied the motion. Palantir.net filed counterclaims for trademark infringement and shortly thereafter filed this motion for a preliminary injunction.

## PRELIMINARY INJUNCTION STANDARD

"A plaintiff is entitled to a preliminary injunction in a trademark case when he demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in his favor." Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1046 (9th Cir. 1991).

## DISCUSSION

**A.  Likelihood of success on the merits**

"The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 198 (1985). Accordingly, the Act provides for civil liability against "[a]ny person

3

who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . , which (A) is likely to cause confusion . . . as to the origin, sponsorship, or approval" of the goods or services. 15 U.S.C. § 1125(a)(1); see also GoTo.com v. Walt Disney Co., 202 F.3d 1199, 1205 (9th Cir. 2000) (holding that to prevail on trademark infringement claims a plaintiff must prove that the defendant is using a mark "confusingly similar" to the plaintiff's).

Here, the parties' only dispute is whether PTI's use of "palantir" is "likely to cause confusion" as to its products' and services' "origin, sponsorship, or approval." "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1140 (9th Cir. 2002) (quoting Dreamwerks Production Group, Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998)).

In AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979), the Ninth Circuit developed an eight-factor test to guide determinations about likelihood of confusion. Enterpreneur Media, 279 F.3d at 1140. The Sleekcraft factors are:

1. The strength of the trademark;
2. The similarity of the marks;
3. The proximity or relatedness of the goods or services;
4. Intent in selecting the marks;
5. Evidence of actual confusion;
6. The marketing channels used;
7. The likelihood of expansion of product lines; and,
8. The degree of care consumers are likely to exercise.

Entrepreneur Media, 279 F.3d at 1140 (citing Sleekcraft, 599 F.2d at 348-49).

In the application of the Sleekcraft test, the court should not "decide whether confusion is likely by considering mechanically the number of Sleekcraft factors that weigh in favor of either party, or by giving the same weight to a particular factor from case to case." Entrepreneur Media, 279 F.3d at 1141 (citing Brookfield, 174 F.3d at 1054)). Instead, the

4

court should "consider what each fact, and – more importantly – what the analysis as a whole reveals about the ultimate question before us." Id.  The Court reviews the factors below.

### *1.    Strength of the Mark*

"The scope of the trademark protection that [the law] give[s] marks depends upon the strength of the mark, with stronger marks receiving greater protection than weak ones." Entrepreneur Media, 279 F.3d at 1141.  "Marks can be conceptually classified along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful." Brookfield, 174 F.3d at 1058.  In its moving papers, Palantir.net asserted that its trademark is "suggestive."  In its Reply, however, it changes position and asserts that its palantir mark is arbitrary or fanciful.  For purposes of this motion, however, the Court must accept Palantir.net's original assertion (and the one to which PTI was given the opportunity to respond), that is, that the mark is suggestive.

PTI cites Brookfield for the proposition that suggestive marks are weak.  The Brookfield court did observe that suggestive marks are presumptively weak, 174 F.3d at 1058, but the court also noted that "[s]ome weak marks are weaker than others." Id.  The court explained further that suggestive marks that are not descriptive, that is, that require a mental leap from the mark to the product or service, are "strong enough to warrant trademark protection." Id.

Accepting Palantir.net's original assertion that its mark is suggestive, it is at the far end of the suggestive spectrum, very near to arbitrary or fanciful, and thus is of at least moderate strength.  It requires a mental leap to go from Palantir.net's mark to its services; indeed, it requires a detailed knowledge of *The Lord of the Rings* and a precipitous climb from *The Lord of the Rings* to Palantir.net's services.  "The more imagination required, the stronger the mark is." Miss World (UK) Ltd. v. Mrs. America Pageants, Inc., 856 F.2d 1445, 1449 (9th Cir. 1988).  Thus, Palantir.net's mark is strong enough to deserve trademark protection.

PTI also argues that the mark is weakened by third-party use of the mark; that is, that the "palantir" mark is part of a "crowded" field of similar marks.  Under such circumstances,

each member of the crowd is relatively "weak" in its ability to prevent use by others in the crowd. Id. at 1449.

> Simply put, a mark which is hemmed in on all sides by similar marks on similar goods cannot be very 'distinctive'. It is merely one of a crowd of marks. In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other.

Id. (internal quotation marks and citations omitted). In Miss World (UK) Ltd., the court held that "Mrs. of the World" was part of a crowded field of similar beauty pageant marks. Id.

The "palantir" mark is *not* part of a crowded field. PTI offers no evidence that other palantir marks or similar marks are in use in the market or for how long. See Charles Schwab & Co. v. Hibernia Bank, 665 F.Supp. 800, 806 (N.D. Cal. 1987) (to demonstrate a crowded field, there must be evidence that the marks are in use in the market and for how long). In 2003, Palantir.net consented to Lane15 Software, Inc.'s use of the mark Palan*tier*, that is, a different spelling. According to Palantir.net, it agreed to Lane 15's use of this mark because of its different spelling and because of the nature of its business--hardware for a particular switching system. In any event, Lane 15 did not use the mark. Thus, Lane 15 is not evidence of a crowded field; to the contrary, it shows that Palantir.net has been diligent in protecting its exclusive right to use its mark.

The other companies identified by PTI are not in business or are new to the United States market. PTI provides only a corporate registration statement for Palantir Corporation. The website given on the registration is inactive and an Internet search reveals no activity for the corporation. The same for Palantir USA, Inc. PTI offers no evidence of Palantir Analytics' operation, goods or marketing. Palantir Solutions is a viable company specializing in economic evaluation, planning and risk analysis for international energy companies. There is no evidence in the record, however, as to how long it has been operating in the United States. From its website it appears to be a London company.

In sum, the evidence does not support a finding that the "palantir" mark is part of a crowded field such that it is entitled to less trademark protection. The strength of the mark factor favors Palantir.net.

6

### *2. Similarity of the marks*

This factor strongly favors Palantir.net. "Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion." Entrepreneur Media, 279 F.3d at 1144 (internal quotation marks and citation omitted). Three axioms apply to the similarity analysis: (1) marks should be considered in their entirety and as they appear in the marketplace; (2) similarity is best adjudged by appearance, sound, and meaning; and (3) similarities weigh more heavily than differences. Entrepreneur Media, 279 F.3d at 1144.

The marks are identical. They sound the same and have the same meaning. While the fonts used by the companies are different, this distinction is meaningless, especially since these companies are essentially marketing services not mass production goods.

### *3. The proximity or relatedness of the goods or services*

"Related goods are generally more likely than unrelated goods to confuse the public as to the producer of the goods." Brookfield, 174 F.3d at 1055. In light of the virtual identity between Palantir.net and PTI's mark, "if they were used with identical products or services likelihood of confusion would follow as a matter of course." Id. at 1056. On the other hand, if PTI and Palantir.net "did not compete to any extent whatsoever, the likelihood of confusion would probably be remote." Id.

In Brookfield, a case involving the marks "moviebuff.com" and "MovieBuff," the Ninth Circuit gave the following example:

> A Web surfer who accessed "moviebuff.com" and reached a web site advertising the services of Schlumberger Ltd. (a large oil drilling company) would be unlikely to think that Brookfield had entered the oil drilling business or was sponsoring the oil driller. See, e.g., Toys "R" Us, Inc. v. Feinberg, 26 F.Supp.2d 639, 643 (S.D.N.Y.1998) (no likelihood of confusion between "gunsrus.com" firearms web site and "Toys 'R' Us" trademark); Interstellar Starship, 983 F.Supp. at 1336 (finding no likelihood of confusion between use of "epix.com" to advertise the Rocky Horror Picture Show and "Epix" trademark registered for use with computer circuit boards). At the least, Brookfield would bear the heavy burden of demonstrating (through other relevant factors) that consumers were likely to be confused as to source or affiliation in such a circumstance.

Id.

//

PTI argues that its business and Palantir.net's business are "radically different." It emphasizes that Palantir.net offers website design services and custom computer services, whereas PTI is not involved in website design or in the provision of custom computer services. Rather, PTI has developed two software programs, Palantir Government and Palantir Financial, for specialized (and customized) use by a select group of clients. All of its services are related to those two products.

PTI's definition of "related services" for purposes of trademark infringement is too narrow. "[T]he relatedness of each company's prime directive is not relevant. Brookfield, 174 F.3d at 156 (internal quotation marks and citation omitted). Instead, the focus is on whether the consuming public is likely somehow to associate" PTI's products/services with Palantir.net's products and services. In Brookfield, for example, the court reasoned:

> Here, both companies offer products and services relating to the entertainment industry generally, and their principal lines of business both relate to movies specifically and are not as different as guns and toys, see Toys "R" Us, 26 F.Supp.2d at 643, or computer circuit boards and the *Rocky Horror Picture Show*, see Interstellar Starship, 983 F.Supp. at 1336. Thus, Brookfield and West Coast are not properly characterized as non-competitors.

Id.

Here, both companies offer products and services relating to the computer software industry generally, and their lines of business include database analysis and management specifically. Their lines of business are not identical, but are certainly related. PTI's emphasis on the fact that it primarily sells a product–Palantir Government and Palantir Financial–whereas Palantir.net sells a service–customized software applications–is a distinction without much significance. Both companies offer clients the ability to manage and analyze data through software. They are not anywhere near as different as guns and toys or computer circuit boards and a movie.

PTI does not cite any case in which a court held that products/services as closely related as those at issue here were deemed "not related" for purposes of trademark infringement. This factor, too, weighs in favor of a likelihood of success of proving infringement.

8

### *4.     Marketing channels used*

PTI also argues that confusion is unlikely because neither it nor Palantir.net market on the Internet or through any similar channel. Instead, PTI uses salespersons who make pitches in person and Palantir.net relies on word of mouth.

Both companies, however, have websites and use their websites to describe their services and as a way for interested customers to contact them. It is easy to imagine how confusion might occur. One project of Palantir.net was a database application for a real estate firm that allows the firm to track the success of different print-based ad campaigns and customize its advertising accordingly. Assume the real estate firm subsequently recommended Palantir.net to a financial services company for a similar project. The financial services company visits the Internet to learn more about Palantir.net. It does not know Palantir.net's domain name (it only remembers that the real estate company recommended "Palantir") and types "palantir" into the Google search engine. The first entry that appears is PTI's website. The financial services company reviews PTI's website, observes that it offers software for analyzing data, and mistakenly believes that it has found the "Palantir" recommended by the real estate company. Upon further review of PTI's website, the financial services company concludes that "Palantir" does not offer exactly what it needs, and that is the end of its inquiry into Palantir.net. Palantir.net unknowingly loses a potential customer due to the confusion generated by the virtually identical marks.

If PTI had no presence on the Internet, its case would be stronger. But not only does it have an Internet presence, it has put resources into building that presence such that it is now the first site that is listed when one Google's "palantir." PTI also maintains a Palantir Technology blog. This factor–marketing channels used–also weighs in favor of a finding of infringement.

### *5.     Nature of goods and degree of care*

The more expensive the product or service, and the more sophisticated the consumer, the less likely there is to be confusion. <u>Brookfield</u>, 174 F.3d at 1060. However, confusion

1  may often be likely even in the case of expensive goods or services sold to discerning
2  customers.  Id.
3      Here, it is unlikely consumers would ultimately purchase PTI's product on the
4  mistaken belief that it was being provided services by Palantir.net.  But that does not alter the
5  scenario discussed above: the consumer who initially investigates Palantir.net's services and
6  mistakenly believes that PTI's website is the company the consumer intended to investigate.

### 6. *Intent*

"When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1394 (9th Cir. 1993).  The evidence here suggests that PTI negligently failed to conduct a trademark review before it began using the palantir mark and apparently did not even perform an Internet search, since such a search would have identified Palantir.net.  But the evidence does not demonstrate that PTI was aware of Palantir.net.  This factor has no bearing on the infringement inquiry.

### 7. *Evidence of actual confusion*

Palantir.net has not produced any evidence of consumer actual confusion.  The Ninth Circuit has held, however, that "[t]he failure to prove instances of actual confusion is not dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy."  Brookfield,174 F.3d at 1050;  see also Cohn v. Petsmart, Inc., 281 F.3d 837, 841 (9th Cir. 2002) ("Because evidence of actual confusion can be difficult to obtain, its absence is 'generally unnoteworthy' and is given little probative weight.").

### 8. *Likelihood of expansion of product lines*

In light of the relatedness of the services presently offered by the parties, this factor does not bear on the Court's analysis.

In sum, the virtual identity of the marks, the relative strength of Palantir.net's mark, the relatedness of the services and goods offered by the parties, and the fact that both use the Internet to provide information about their businesses, all support a finding of a probable

success on the infringement claim or, at a minimum, the existence of serious questions going to the merits.

**B.      Balance of hardships**

Having determined that Palantir.net has–at a minimum–demonstrated the existence of serious questions going to the merits, the next question is whether the balance of hardships tips sharply in Palantir.net's favor. It does.

First, Palantir.net has been using the "palantir" mark since 1996 and applied for trademark registration in 2002. PTI, in contrast, chose the palantir mark in 2004 without even bothering to perform a trademark search or apparently even a Google search.

Second, since Palantir.net receives most of its business through word of mouth, its mark is important to the success of referrals. PTI, on the other hand, has had but few clients; thus, its mark is not as important to the success of its much younger business.

Third, a preliminary injunction need not enjoin PTI's use of "palantir" in total. The primary injury that would occur to Palantir.net between now and a trial is the likelihood of confusion on the Internet; that is, a potential client searching for Palantir.net on the Internet and mistakenly believing that PTI's website is Palantir.net. A preliminary injunction could be designed to eliminate, or at least alleviate, that injury pending trial by requiring PTI to place a prominent disclaimer on its website that advises viewers it is not Palantir.net and directs viewers to Palantir.net if that is what they are seeking.

## CONCLUSION

Palantir.net has easily proven the existence of serious questions going to the merits; indeed, the Court finds that it has also demonstrated a probable success on the merits given (1) the virtual identity of the marks, (2) the strength of the mark, (3) the relatedness of the goods, and (4) both parties' use of the Internet. The balance of hardships also tips sharply in Palantir.net's favor given its long-time use of the mark, the importance of the mark to word-of-mouth referrals, and PTI's recklessness in adopting the mark for its young business without first searching for any similar trademarks. Palantir.net's motion for a preliminary injunction is therefore GRANTED.

1       Pending the April trial, and within seven days of the date of this Order, PTI shall place
2 on all of its websites, including its Tech Blog website, a prominent disclaimer that advises
3 viewers that it is different from Palantir.net and that advises viewers how to access
4 Palantir.net. The parties shall meet and confer on an appropriate disclaimer. PTI is also
5 prohibited from engaging in any Internet advertising under the palantir mark, that is, no more
6 Google advertisements. PTI may continue to utilize the Internet to advertise for employees;
7 however, such advertisements must also include a disclaimer so that there is no likelihood
8 that prospective job applicants will be confused about the company advertising the position.
9       **IT IS SO ORDERED.**

11 Dated: Jan. 15, 2007       CHARLES R. BREYER
      UNITED STATES DISTRICT JUDGE